**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

DOCKETED

MAR 0 6 2002

02C 1611

| | |
|---|---|
| **MONOSOL, L.L.C.** | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **CAST FILM TECHNOLOGY, INC.,** | ) |
| **AQUAFILM, L.L.C., HENRY E. KNOOP** | ) |
| **and JAMES M. ROSSMAN,** | ) |
| | ) |
| **Defendants.** | ) |

Civil Action No.

MAGISTRATE JUDGE
GERALDINE SOAT BROWN

## COMPLAINT

Plaintiff, MonoSol L.L.C. ("MonoSol"), by its attorneys, complains against defendants

Henry Knoop ("Knoop"), James M. Rossman ("Rossman"), Cast Film Technology, Inc. ("Cast

Film") and Aquafilm LLC ("Aquafilm"), as follows:

## I.    INTRODUCTION – A THREE PART CONSPIRACY

1.    This lawsuit is about the continuing efforts of James M. Rossman to compete

unlawfully against his former employer, MonoSol, LLC (formerly known as Chris-Craft

Industrial Products, Inc. "CCIP"). It is also about a conspiracy among the defendants to commit

industrial espionage to steal the trade secrets of MonoSol and to use those trade secrets to usurp

MonoSol's position as the largest manufacturer of polyvinyl alcohol ("PVOH") films in the

United States, enjoying the largest market share for such products in North America and Western

Europe, and its position as global leader in innovating the technology of PVOH film into new

and profitable applications. MonoSol alleges in this complaint that, through their illegal

conspiracy to steal MonoSol's secrets, the defendants have violated RICO, the Illinois Trade

Secrets Act, the Indiana Trade Secrets Act and have committed breaches of a confidentiality

agreement, tortious inducement and civil conspiracy. MonoSol further alleges that Rossman and Cast Film have breached a settlement agreement ("the Settlement Agreement") that resolved prior litigation between MonoSol, Rossman, Cast Film and others.

2. As alleged further below, defendants' conspiracy has had three parts: (i) while President of CCIP, in 1997, Rossman covertly competed against CCIP to bid to buy Aquafilm; (ii) while President of CCIP, in late 1997 and 1998, Rossman unlawfully conspired with Kuraray Company, Ltd.(Kuraray), a large Japanese competitor, to steal CCIP's confidential information as part of a plan to establish Cast Film to represent Kuraray in competition against CCIP in the United States and Western Europe; (iii) currently, Rossman, Aquafilm and Cast Film, with the assistance of another former MonoSol employee, Henry Knoop, have stolen MonoSol's confidential drawings, samples of band caster belt steel, product samples, PVOH film formulations, specifications, technical manuals and other highly secret technical information in an apparent effort to copy MonoSol's most recently built band casting line for manufacturing PVOH film and MonoSol's proprietary PVOH film products.

3. In this complaint, MonoSol seeks injunctive relief and damages against the defendants' illegal conduct resulting from the third part of their conspiracy. MonoSol also seeks to set aside the Settlement Agreement that resulted from the prior litigation between CCIP, Rossman, Cast Film and Kuraray relating to the first and second parts of the defendants' conspiracy. Thus, MonoSol also requests that the claims against Rossman and Cast Film that were dismissed pursuant to the Settlement Agreement in the prior litigation be reinstated and set for trial.

## II. JURISDICTION AND VENUE

4.  This action seeks to remedy violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68; and state common and statutory law as set forth below.

5.  The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332; 18 U.S.C. § 1964(c); and on the principles of supplemental jurisdiction.

6.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(d) and 18 U.S.C. §1965(a). Many claims alleged herein arose in this District; many acts and transactions that were part of the unlawful conspiracy occurred in this District; a substantial part of the fraudulent scheme alleged herein occurred in this District; and the parties to the Settlement Agreement have agreed to submit all claims to this Court.

## III. THE PARTIES

### A. MonoSol L.L.C.

7.  Plaintiff MonoSol L.L.C is a Delaware corporation headquartered in Portage, Indiana.

8.  MonoSol was formerly Chris-Craft Industrial Products, Inc. ("CCIP"), a subsidiary of Chris-Craft Industries, Inc. On August 7, 2001, MonoSol's current management acquired CCIP from Chris-Craft Industries and renamed it MonoSol. Before August 7, 2001, CCIP was headquartered in Northbrook, Illinois.

9.  MonoSol is a globally leading company in the manufacture of polyvinyl alcohol ("PVOH") water-soluble films. It has been manufacturing water-soluble films since 1953. Today, it employs approximately 125 employees, primarily in Portage, Indiana.

**B.** **James M. Rossman**

10.     James M. Rossman is a citizen of Illinois and the former president of CCIP. He

was employed by CCIP for eighteen years and served as the company's president from 1989

until resigning on June 26, 1998. Rossman now is president of Cast Film and has an equity

interest in Cast Film LLC, Cast Film Europe and is an owner and director of Aquafilm. Rossman

also is employed by Aquafilm in an unknown capacity. For much of the time during his

employment with CCIP, Rossman worked in Northbrook, Illinois, and resided in Winnetka,

Illinois. Rossman now resides in Libertyville, Illinois.

**C.** **Cast Film Technology, Inc.**

11.     Cast Film Technology, Inc. is an Illinois corporation with its principal place of

business in Island Lake, Illinois. Cast Film was incorporated in Illinois on June 5, 1998. It was

co-founded by Rossman and Daniel B. Brucki. After leaving CCIP, Rossman immediately

became the president of Cast Film.

12.     Cast Film was established in 1998 to compete against MonoSol.

**D.** **Henry E. Knoop**

13.     Henry Knoop is a citizen of Indiana and is MonoSol's former Technology

Manager. He resigned from MonoSol on August 17, 2001. Before his resignation, Knoop was the

project manager charged with responsibility for supervising the design and construction of

MonoSol's new band casting line for manufacturing PVOH films. Knoop has had contact with

this district relating to the conspiracy alleged in this complaint through wire communications,

and, on information and belief, meetings with co-conspirators located in this district.

14.     Although Knoop told MonoSol that he would not work for MonoSol's

competitors and specifically stated that he would not work with Rossman, Knoop is now known

to be employed by Rossman at Aquafilm where, on information and belief, he is assisting

Aquafilm to build a band casting line. At or about the time of his resignation from Monosol,

without authorization, Knoop removed valuable confidential information from MonoSol,

including at least: confidential drawings, samples of band caster belt steel, product samples,

PVOH film formulations, specifications, technical manuals and other highly secret technical

information. Much of this confidential information relates directly to the design, construction and

operation of MonoSol's new and highly innovative band casting line. In removing these

materials without authorization, Knoop has misappropriated MonoSol's trade secrets, breached

his confidentiality agreement and acted overtly in furtherance of the defendants' unlawful

conspiracy. It is not possible for Knoop to work for Aquafilm without inevitably using or

disclosing MonoSol's trade secrets for Aquafilm's benefit in violation of law.

      E.      **Aquafilm, L.L.C.**

      15.     Upon information and belief, Aquafilm L.L.C. is a Florida corporation with its

principal place of business in Florida. Aquafilm has a regular place of business in Island Lake,

Illinois, in this district. Until recently, Aquafilm was known as Cast Film Technology, L.L.C.

Aquafilm's ultimate parent company is Cast Film, also located in this district, and Aquafilm is

regularly doing business in Illinois.

## IV.    FACTUAL BACKGROUND AND COMMON ALLEGATIONS

      A.      **MonoSol's Business**

      16.     MonoSol develops and manufactures polyvinyl alcohol ("PVOH") water-soluble

films. It markets and sells its films in the United States and in countries around the world.

      17.     PVOH water-soluble films are thermal plastic thin films that can be produced by

solution casting methods. Historically, MonoSol has manufactured and sold water-soluble films

for use in, among other things, medical applications, agricultural packaging, home and industrial

detergent packaging, personal care products such as bath beads, embroidery processes, industrial

dye packaging, fabrication of solid surface artificial marble, and fabrication of reinforced

fiberglass.

18.    Manufacturing PVOH water-soluble films is extremely difficult and technically

intensive. MonoSol has developed unique and secret technical know-how that assures that its

films perform in end-use applications with consistency and accuracy. This technical know-how

was developed over a long period of time through trial and error in manufacturing films for a

wide variety of uses by different customers according to different specifications. In many

respects, this technical knowledge is unique to MonoSol, is the result of very significant

monetary investments by MonoSol, and constitutes a valuable MonoSol trade secret.

19.    The development of MonoSol's technical know-how has recently culminated in

its development and installation of its Line 5 band casting production line. Line 5 incorporates

several unique features and processes not commonly known in the industry.  These features and

processes result in an end product of superior quality to that of MonoSol competitors, produced

at a higher efficiency and lower cost than can be done by MonoSol competitors. MonoSol's

development and installation costs for line 5 totaled millions of dollars. Line 5 began production

in October 2001.

20.    MonoSol has invested significantly in developing its sales and marketing

capabilities. MonoSol's improved sales and marketing capabilities have garnered detailed market

knowledge of the users of water-soluble films worldwide and the products they use. Because

PVOH water-soluble films are often specialized products, prepared specifically for a customer's

unique needs, MonoSol treats all information relating to a product and customer use of the

product as highly confidential. In addition, the pricing relating to specialty films (films other than list price films) and the cost to produce those specialty films are not known by MonoSol's competitors or customers and are a closely guarded trade secret of MonoSol.

**B.    Safeguards for Confidential Information**

21.    MonoSol takes reasonable measures to protect its confidential information. For example, employees are required to sign confidentiality agreements. MonoSol also operates under non-disclosure agreements with its primary customers. In some cases, the mere existence of the non-disclosure agreement or the relationship with a customer is itself proprietary and confidential. In other cases, MonoSol uses non-disclosure agreements with its vendors, contractors and suppliers. MonoSol also restricts access to its manufacturing facilities and development laboratories, and all entrants are required to sign a facilities non-disclosure agreement. Formulas, manufacturing and other process specifications and product specifications are regarded as highly confidential and are subject to restricted circulation within the company. Financial information of MonoSol is also treated as highly confidential. Documents containing such information are, in appropriate cases, stamped "confidential" and circulation is restricted.

22.    As former president, Rossman had the responsibility to implement and police CCIP's policies and procedures to protect its confidential information. Like other CCIP and MonoSol employees, Rossman signed a non-disclosure agreement with CCIP and has reminded (in writing) CCIP's employees about the importance of maintaining confidentiality. His non-disclosure agreement is attached hereto as **Exhibit A** and is incorporated by reference.

23.    As former Technology Director, Knoop was familiar with CCIP's policies and procedures to protect its confidential information. Like other CCIP employees, Knoop signed a

non-disclosure agreement with CCIP. His non-disclosure agreement is attached hereto as **Exhibit B** and is incorporated by reference.

**C.** **3 Schemes to Steal CCIP's Business Secrets**

24. In early 1997, Rossman, the then-president of CCIP, embarked upon an illegal conspiracy to steal confidential business information of CCIP. First, Rossman supplied confidential CCIP information to enable two co-conspirators to outbid CCIP to purchase Aquafilm, another water-soluble film manufacturer, which CCIP hoped to acquire as part of its plan to grow its business. Rossman's scheme was foiled (at least for a time) when Aquafilm's owners withdrew Aquafilm from sale. Second, after failing to acquire Aquafilm, in November 1997, Rossman then formed an alliance with Kuraray to create a new company to compete against MonoSol. Pursuant to their secret pact, Kuraray and Rossman agreed that Kuraray would support the establishment by Rossman of Cast Film Technology, Inc. that would distribute Kuraray's film products in the United States and Europe in competition with CCIP. They further agreed that Rossman and Cast Film would help Kuraray solicit CCIP's customers using CCIP's confidential information. The scheme was foiled when CCIP learned of Rossman's duplicitous conduct and filed suit against Kuraray and Rossman in November 1998 (Chris-Craft Industrial Products, Inc. v. Kuraray Company, Ltd, et al., No. 98 C 7298, N.D. Illinois.) Third, even as that lawsuit was being settled in August 2000, Rossman was hatching another scheme. He concealed from CCIP that he had re-started negotiations to buy Aquafilm, which resulted in Cast Film's purchase of Aquafilm in December 2000. Rossman and Cast Film then used Aquafilm to solicit CCIP's customers in breach of the Settlement Agreement. Further, at an unknown time in the immediate past few months, Aquafilm has hired Knoop and together they have stolen valuable

technical information from MonoSol with the apparent intent to duplicate the innovative features of MonoSol's new band casting line and MonoSol's proprietary products.

**March - October 1997**

25.     During 1997, CCIP investigated the possibility of acquiring Aquafilm (later purchased by Cast Film Europe and whose board of directors includes Rossman, as alleged below). Aquafilm, then a division of LINPAK Plastics International, Ltd., was a potentially attractive acquisition opportunity for CCIP because it complemented CCIP's geographic markets with a heavy presence in the United Kingdom and Europe. It also complemented CCIP's technology because Aquafilm employed non-casting technology to manufacture its PVOH water-soluble films.

26.     Prior to 1997, Rossman vocally supported the idea that CCIP should acquire Aquafilm. As President of CCIP, Rossman had made studies of the value that Aquafilm would bring to CCIP and, in 1996, obtained authority from Chris-Craft's board to investigate the acquisition. In March of 1997, CCIP learned that Aquafilm was "in play". That is, another buyer, Jeffrey Lawrence, had made an offer that was being actively considered by Aquafilm's owner, LinPac Plastics Limited ("LinPac"). CCIP reacted quickly with an expression of interest and requests for financial data.

27.     LinPac was not willing to provide the requested financial information, but invited CCIP to make a bid. When CCIP declined to bid without more information, LinPac broke off the dialogue explaining that it was negotiating with another potential buyer. Chris-Craft responded that it remained interested and, if no deal was consummated with the first buyer, then Chris-Craft would be interested in acquiring Aquafilm.

28.    Rossman monitored Chris-Craft's communications with LinPac and formulated a scheme whereby, if no deal was consummated with Lawrence, he would make an offer to buy Aquafilm on his own behalf before Chris-Craft could begin its dialogue with LinPac. Rossman needed financing to buy Aquafilm so he brought in two partners, John Wright of the UK, and John Watson of Polymer Film in Connecticut. Rossman gave Watson and Wright the study that he had presented to Chris-Craft's board of directors. He also enticed Watson and Wright by the prospect of being able to steal two of CCIP's biggest customers – if Aquafilm could be purchased.

29.    In May 1997, Watson and Wright made an offer to LinPac with Rossman's assistance. LinPac negotiated with Watson/Wright for a number of months, but no deal was consummated. It became "official" that the offer would not be accepted on October 31, 1997. On that date, Rossman drew a doodle of a frowning face in his diary with the notation "deal is dead." In December 1997, Chris-Craft tried to interest LinPac in discussing a sale to Chris-Craft, but to no avail. In reply, LinPac announced that Aquafilm was no longer for sale. The Watson/Wright offer aided and abetted by Rossman had foreclosed the opportunity for Chris-Craft to negotiate with LinPac after Lawrence's offer was rejected.

**November 1997**

30.    In November 1997, Noriyuki Sonoda ("Sonoda") was the deputy general manager of Kuraray Japan's POVAL Division, which manufactures PVOH film in competition with CCIP. Sonoda was based in Kuraray Japan's headquarters in Osaka. His responsibilities included the expansion of Kuraray's PVOH film sales. Sonoda is personally acquainted with Rossman and has known him for many years. Sonoda knew that Rossman was president of CCIP. He also knew that CCIP and Kuraray were competitors in the area of water-soluble films

31.     On November 5, 1997, just a few days after he drew his frowning face doodle upon learning that he would not acquire Aquafilm, Rossman faxed a letter to Sonoda. The letter was sent from Illinois to Kuraray Japan's headquarters in Osaka. In the letter, Rossman advised Sonoda that he intended to leave CCIP and that he was interested in the possibility of forming a new company that would compete with CCIP in the area of PVOH film. Rossman proposed that he and Kuraray "work together" in this venture. Rossman asked Sonoda to reply to his private fax machine located at his home in Winnetka, Illinois. Rossman also asked that Sonoda: "Please treat this letter as CONFIDENTIAL since I have not yet made public my intention to leave Chris-Craft."

32.     In the letter, Rossman wrongfully disclosed a series of highly confidential facts regarding: (i) CCIP's actual and forecasted sales and pretax earnings; (ii) CCIP's internal business development activities related to PVOH film; (iii) CCIP' s internal estimate of the current market for PVOH film in North America and Europe; (iv) CCIP' s internal estimates of the growth in the market for PVOH film in North America and Europe; and (v) CCIP's internal assessment of growth prospects of the various participants in the PVOH film market.

33.     Kuraray's response to Rossman's proposal was positive. On or about November 11, 1997, Sonoda sent a letter from Osaka to Rossman' s private home fax machine. In the letter, Sonoda told Rossman that Kuraray was interested in pursuing this "new project about PVOH films." Sonoda advised Rossman that the president of Kuraray America, Koji Fujita ("Fujita"), and the executive vice president of Kuraray America, Hiroyuki Yonekura ("Yonekura"), would speak with Rossman. He directed Rossman to contact them at the office of Kuraray America in New York, New York. Sonoda provided Kuraray America's address, telephone number and fax number.

34. On November 12, Sonoda followed up with a phone call to Rossman. Later that day, Rossman faxed a letter to Sonoda.

35. On November 13, Fujita, the president of Kuraray America, sent a letter from Kuraray America's New York office to Rossman's home fax machine. Fujita stated that he was eager to discuss the details of Kuraray's "collaboration" with Rossman as soon as possible. The same day, Rossman placed a call from his office at CCIP's headquarters in Northbrook, Illinois to Kuraray America's New York office. Fujita also called Rossman. On November 14, Rossman called Fujita again. As a result of their phone conversations, Fujita and Rossman arranged a meeting to be held in Chicago on November 19.

36. In preparation for the meeting, Rossman used his position as CCIP's president to obtain highly confidential internal documents regarding CCIP's vendor relationships and prices. The documents contained detailed information concerning CCIP's resin purchases, and identified types of resins purchased, suppliers, purchase dates, prices and quantities. Rossman obtained this information on November 18, 1997.

37. The next day, November 19, Rossman met covertly with Fujita and Yonekura at Nick's Fishmarket, a restaurant in downtown Chicago. They discussed the formation of a new company to be headed by Rossman that would work closely with Kuraray. The new company would serve as a vehicle to distribute Kuraray's films and to otherwise aid Kuraray in competing against CCIP in North America and Europe. On information and belief, during this meeting, Rossman illegally disclosed confidential information concerning CCIP, including the highly confidential vendor information he had obtained the previous day.

**December 1997**

38.     On December 1, 1997, Yonekura, Fujita and Rossman exchanged letters. Yonekura thanked Rossman for the time spent meeting in Chicago and expressed the desire to "continue in close communications to further develop our relationship." He added that he hoped that "our new business association of mutual interest" would be established "in the very near future." Rossman advised that he would send "additional information," which Kuraray requested, to Fujita and Yonekura later in the week.

39.     On December 8, Rossman sent a letter to Fujita by facsimile from Illinois to Kuraray America's New York office. The letter memorialized aspects of the Rossman-Kuraray scheme: Rossman and Kuraray would exchange technology related to water-soluble films; Rossman would form a new company to market Kuraray's PVOH films in the U.S. and Europe; and Kuraray would invest "some portion of the funding needed to start up [Rossman's] new company." The letter also provided information requested by Kuraray including:

>  (i)     CCIP' s confidential estimates of the market size for water-soluble film in the U.S. and Europe for 1997, and its projections through 2002; and

>  (ii)    CCIP's confidential market share estimates for various companies in the soluble film business.

40.     On or about December 12, Yonekura faxed a letter from New York to Rossman's home. The letter contained a list of requests for CCIP' s highly confidential business information. Copies of the fax were also sent to Sonoda and Fujita. Rossman received the letter on Sunday, December 14.

41.     The information Yonekura requested went to the heart of CCIP's business:

In order to proceed with our intensive study of this project, we would like to know more about PVOH film market and Chris-Craft Industrial Products, Inc.'s business. Toward this end, we appreciate it very much if you could tell us to as much extent as possible, on the CCIP' s sales volume and selling price (unit price) to its customers by following each segment and application (also, territorial breakdown between USA and Europe, if possible).

Yonekura specifically asked that the data be provided by market segment including water-soluble film, mold release film, optical film, transfer printing film, embroidery film and vacuum packaging film. Yonekura expressed "appreciation" for Rossman' s "continued interest in collaboration with us."

42. Fujita and Rossman spoke by telephone on Monday, December 15.

**January 1998**

43. Rossman responded to Yonekura' s December 12 request by a letter transmitted by facsimile to Yonekura in New York on January 5, 1998. In the letter, Rossman wrongfully divulged: a copy of a price list for CCIP's PVOH film; CCIP proprietary information regarding CCIP's 1997 sales for the U.S. and Europe; CCIP proprietary information regarding each market segment for PVOH film; and CCIP's internal estimates of projected sales in 1998.

44. Rossman knew that the information he furnished to Kuraray was confidential and proprietary. Kuraray also knew that the information was extremely sensitive competitive information and that it belonged to CCIP. In his letter, Rossman underscored the point, advising Yonekura: "Much of this information is highly **confidential** and it must be used very carefully by Kuraray America and Kuraray in Japan. I would request that it be marked confidential and that it have **very limited distribution** within Kuraray."

45. On January 8, Rossman placed a telephone call to Kuraray America, in New York.

46.     In late January or early February 1998, Rossman -- at Kuraray's request -- furnished Kuraray with a "business plan" for the new company that would be formed to compete with CCIP. A copy of the business plan was retrieved from the hard drive of Rossman's computer. It shows that the new company -- which later became known as Cast Film -- would purchase Kuraray PVOH film products and resell them in North America and Europe. It would also engage in funded product development and the manufacture and development of new film products.

47.     The business plan highlighted the "special relationship with Kuraray." In addition to selling Kuraray's PVOH films, the new company would "utilize Kuraray technology and technical support," "borrow technical manpower from Kuraray" and "utilize financing and management support from Kuraray-America."

48.     The business plan made liberal use of CCIP's confidential business information. For example, it incorporated CCIP's market intelligence information regarding CCIP's prospects and those of other participants in the market for PVOH film. It also disclosed Rossman's views regarding areas of CCIP's weakness, its "vulnerability" to competition, and "the best way for the Japanese to penetrate and hold positions" in CCIP's markets for PVOH film in the U.S. and Europe. In short, by preparing the business plan and giving it to Kuraray, Rossman provided Kuraray with a roadmap for attacking CCIP.

**February-March 1998**

49.     Rossman flew to New York on February 5, 1998, for a meeting on February 6, with Kuraray America officials, including Fujita and Yonekura. The meeting was held at the offices of Kuraray America to conceal its occurrence from CCIP. During the meeting, Fujita, Yonekura and Rossman discussed the business plan for the new company. Rossman briefed

Kuraray on "competition" in the market for PVOH film products and, in particular, the "Future of Mono-Sol." (Mono-Sol is the division of CCIP that manufactures PVOH film.) The Kuraray representatives and Rossman also discussed arrangements for the formation of the new company, the funding of and participation in the new company by Kuraray, and the supply of Kuraray film products to the new company.

50. Rossman continued plotting against CCIP during the remainder of February and through March 1998. Rossman communicated regularly with Kuraray by fax, e-mail and telephone. Among other things, Kuraray and Rossman exchanged extensive information regarding PVOH film pricing, the types of Kuraray film the new company would sell and the prices at which Kuraray would make its film available. During this process, Rossman disclosed confidential information regarding CCIP' s film pricing.

51. Akira Matsuzawa ("Matsuzawa") is a director of Kuraray Japan. Beginning at least as early as February 1998, he became aware of, and participated in, Kuraray's dealings with Rossman. Among other things, Matsuzawa was consulted in connection with, and approved, prices at which Kuraray's film products would be sold to the new company, to enable it to compete against CCIP.

**April-June 1998**

52. Rossman sent a letter to Fujita via e-mail on April 1, 1998. The letter responded to requests from Kuraray for specific information concerning CCIP's production of PVOH film and its agreements with its customers and suppliers. In the letter, Rossman illegally disclosed a host of CCIP's confidential trade secrets, including: (i) information regarding the use by CCIP of scrap PVOH film in the manufacture of new film; (ii) information regarding the prices CCIP pays to large customers to buy back used film; (iii) information concerning the amount of PVOH

resin CCIP purchases per year; and (iv) information about the volume discounts CCIP receives from its suppliers.

53.     Fujita and Yonekura continued to communicate with Rossman by faxes, e-mails and telephone calls though the month of April 1998.

54.     On May 16, 1998, Rossman traveled to New York. The purpose of the trip was to attend a meeting with Kuraray on May 18. The meeting was kept secret from CCIP and was held at Kuraray America's headquarters. The meeting was attended by Fujita, Yonekura and Rossman. During the meeting, the Kuraray representatives and Rossman further discussed plans for the new company, including its start up costs, spending levels, and hiring needs. They also discussed the preparation of a written distributorship agreement between Kuraray and the new company.

55.     Either at the May 16 meeting or shortly thereafter, Yonekura asked Rossman to provide Kuraray with samples of, and information regarding, CCIP's proprietary PVOH film technology. Yonekura indicated that, upon receipt, the samples and information would be shipped to Japan to permit Kuraray to "evaluate" CCIP's products and identify the Kuraray films that were the best "match."

56.     Rossman provided the requested information in a package shipped from Illinois to Yonekura at Kuraray America's office in New York, via Federal Express, on June 4, 1998. The package enclosed CCIP film samples and other materials concerning CCIP's proprietary film technology.

57.     In the cover letter which accompanied the shipment, Rossman wrote:

> Enclosed are samples of the major film products manufactured by the Mono-Sol Division of Chris-Craft Industrial Products, as you requested for Mr. Oda. I've also enclosed product data sheets for each of these films and a small selection of other literature which may assist Mr. Oda in evaluating the films.

I have prepared a list of the film samples with a description of each sample. Additional information is provided on the market applications for each film as well as a range of data on thickness, roll length, width and core sizes. I hope this will enable Mr. Oda to identify the Kuraray film grades which are the best match for these films.

Please let me know if I can provide additional information.

58.     As indicated by the cover letter, Rossman's illicit shipment included: (i) samples of CCIP's film products; (ii) CCIP's product data sheets; (iii) additional CCIP literature to assist "Mr. Oda in evaluating the films"; (iv) a list of the film samples and a description of each sample; (v) information regarding the market application for each film; and (vi) data for each sample on thickness, roll length, width and core size.

59.     Fujita e-mailed Rossman to confirm that he had received the materials and that he would forward them to Matsuzawa in Japan.

60.     On June 17, 1998, Yonekura sent Rossman a draft distributorship agreement.

61.     Rossman prepared a letter dated June 20 notifying CCIP and its parent Chris-Craft Industries, Inc. of his intention to resign as president of CCIP effective Friday, June 26. June 20 was a Saturday. CCIP and Chris-Craft Industries, Inc. did not receive Rossman's letter until Monday, June 22.

62.     On June 23, Rossman secretly met with Fujita in Lisle, Illinois, at the offices of EVAL, a Kuraray subsidiary.

**The Incorporation of Cast Film**

63.     Prior to resigning from CCIP, Rossman, with the knowledge and approval of Kuraray, arranged for the incorporation of Cast Film Technology, Inc. ("Cast Film"). Cast Film was the name selected for the new company that Kuraray and Rossman created to compete against CCIP.

64.     Cast Film's articles of incorporation were signed on or about June 1, 1998. The company was formally incorporated on June 5, 1998. To hide Rossman's involvement, Rossman arranged for his longtime friend and business associate, Daniel B. Brucki, to sign the articles of incorporation. Upon resigning from CCIP, Rossman became Cast Film's president.

## Rossman Goes to Japan

65.     On Friday, June 26, 1998, Rossman terminated his employment at CCIP, boarded an airplane in Chicago, and flew to Japan. Fujita flew to Japan on the same day.

66.     On Monday, June 29, Rossman met with senior Kuraray representatives at Kuraray Japan's headquarters in Osaka.

67.     On June 30, Rossman toured Kuraray Japan's laboratory and production facilities in Kurashiki, Japan.

68.     On July 1, Rossman visited Kuraray Japan's laboratory and production facilities at Saigo, Japan.

69.     Rossman returned to Osaka for additional meetings with Kuraray on July 2-4, 1998. He flew from Japan to Chicago on July 5.

70.     While Rossman was in Japan, he met with numerous Kuraray representatives including, on information and belief, Kuraray Japan directors Matsuzawa and Sato, and Kuraray America president Fujita. The Kuraray representatives discussed with Rossman details regarding the ongoing collaboration between Kuraray, Rossman and Cast Film.

## Cast Film Targets CCIP's Customers

71.     The Kuraray-Rossman-Cast Film conspiracy involved more than the theft of CCIP's trade secrets; it also extended to the use of CCIP' s confidential information to wrongfully compete against CCIP for new customers and to divert business from CCIP's

existing customers. Pursuant to their alliance, Kuraray, Rossman and Cast Film agreed that Rossman and/or Cast Film would disclose CCIP's key customers in the United States and Europe, identify the films used by those customers, assist Kuraray in modifying its film products to "match" those sold by CCIP, help Kuraray price its products so as to undercut CCIP, assist Kuraray in preparing sales literature, brief Kuraray as to customers' special needs and wants, and set up meetings with prospective customers.

72.     Following his return to the United States in early July 1998, Rossman began making arrangements for Kuraray representatives to meet with potential customers for water-soluble films. Rossman worked out of Cast Film's office in Island Lake, Illinois. On behalf of Kuraray, Rossman -- using confidential knowledge obtained as president of CCIP --contacted CCIP customers, and others, and attempted to set up meetings. He also worked with Kuraray to prepare marketing materials.

73.     Rossman arranged for and coordinated a series of meetings and activities for Kuraray representatives, several of whom were traveling to the United States from Japan. For example, in late July, Rossman sent a letter to Fujita that included an itinerary for the week of August 3. The plans for that week included visits to film customers in the Boston area. On July 25, Rossman sent a memorandum from his office at Cast Film to Oda at Kuraray Japan, in Osaka, that included a proposed schedule for the weeks of August 10 and 17. Rossman recommended that during this time period, he, Oda and likely others visit as many potential customers as possible. The Kuraray representatives and Rossman would also work on "data sheets, literature and technical plans" for Kuraray's PVOH film laboratories and manufacturing facilities.

74. Representatives of Kuraray Japan, including Oda and Ohnishi, traveled to the United States in or about late July or early August, and remained in the United States through approximately August 20. With Rossman's assistance, they contacted and visited numerous customers for water-soluble films, including customers of CCIP.

75. With Rossman's assistance, the Cast Film – Kuraray conspiracy targeted many of CCIP's key accounts, including those discussed below.

## 1. **DuPont**

76. DuPont was one of CCIP's largest customers, and CCIP's longstanding relationship with DuPont of over 30 years was a relationship of substantial value to CCIP. CCIP invested significantly in creating, developing, maintaining and enhancing that relationship. In particular, CCIP completed several capital equipment programs geared toward improving film quality specifically for DuPont's Corian® product. As a result of these improvements, CCIP was a preferred supplier of film to DuPont for its Corian® product.

77. Cast Film and Kuraray conspired with Rossman to try to usurp CCIP's position as DuPont's preferred supplier of films. While he was still the president of CCIP, Rossman shared with Kuraray the fact that CCIP has devised numerous improvements in the manufacturing process which Kuraray would have to "duplicate" if Kuraray hoped to steal the DuPont business from CCIP. Moreover, Rossman shared with Kuraray, while he was still the president of CCIP, secret data relating to DuPont's plans for producing its Corian® product as well as secret information and data relating to CCIP's production limitations and plans to make changes at its Portage, Indiana plant in order to overcome those limitations to manufacture film suitable for DuPont's Corian® product requirements.

78.     A document recovered from the hard drive of Rossman's computer confirmed that Kuraray and Rossman, by exploiting CCIP's trade secrets, schemed to replace CCIP as the favored supplier of PVOH film to DuPont Corian®:

STRATEGY TO DOMINATE

DuPont must be confident that we [Kuraray/Cast Film] know what we are doing and won't let them down once they commit to us.

I believe DuPont would welcome another domestic film supplier for Corian. [CCIP has been unwise in their recent pricing behavior at DuPont and has left the door open for another supplier to enter the picture.

### 2.    **Bush Viotech**

79.     Bush Viotech ("Bush Viotech") is a German corporation, headquartered in Oldenburg, Germany. It is a subsidiary of a U.S. company, Bush Industries, Inc. ("Bush Industries"), which is based in Jamestown, New York. Bush Viotech manufactures transfer printing technology products. The processes employed by Bush Viotech depend upon the use of PVOH film. Bush Viotech was a customer of CCIP for PVOH film.

80.     In or about October 1997, CCIP and Bush Viotech entered into confidential discussions concerning the development of a special type of PVOH film. Bush Viotech provided detailed specifications for this new film pursuant to a non-disclosure agreement. CCIP made significant investments in developing this product and in establishing the capacity to manufacture and supply it.

81.     As CCIP's former president, Rossman knows about CCIP's relationship with Bush Viotech. In particular, he was aware of Bush Viotech's plans for a new PVOH film

application, its discussions with CCIP on the subject, and its technical requirements. He is also well aware of the efforts by CCIP to develop and manufacture the new film.

82.     Cast Film and Kuraray conspired with Rossman to try to wrest Bush Viotech's business from CCIP. On information and belief, Rossman shared with Kuraray CCIP's confidential information relating to Bush Viotech. Moreover, in or about July or August 1998, Rossman arranged for a meeting with Bush Industries. The meeting was held in early August in Erie, Pennsylvania, where Bush Industries has a facility, and was attended by Rossman and various Kuraray representatives, including Fujita.

83.     The meeting in Erie, Pennsylvania led to a meeting with Bush Viotech, in Germany, which was attended by representatives of Kuraray, including the managing director of Kuraray Europe. On information and belief, at the meeting, Kuraray showed up with a film that it claimed was suitable for Bush Viotech's new application.

84.     Faced with Kuraray's unlawful competition, in order to retain Bush Viotech's business, CCIP expended substantial additional resources and significantly reduced its product prices.

**3.     Jeyes Ltd.**

85.     In or about October 1998, Kuraray contacted Jeyes, Ltd. ("Jeyes"), a manufacturer of household cleaning products, located in the United Kingdom. PVOH film is used in connection with certain of these products. Jeyes was a CCIP customer for many years. Rossman knew Jeyes was a CCIP customer and was aware of its needs regarding PVOH film. Kuraray had never approached Jeyes regarding PVOH film prior to Rossman's departure from CCIP. On information and belief, Rossman shared with Kuraray confidential information of CCIP relating to Jeyes and arranged for or facilitated Kuraray's contact with Jeyes.

### 4. **Manitoba Italia S.P.A.**

86.     In August 1998, Kuraray and/or its European distributor met with Manitoba Italia

S .P.A. ("Manitoba"), an Italian company, headquartered in Milan. Manitoba manufactures

detergent and disinfectant products which utilize PVOH films. It had been a longstanding

customer of CCIP, through Green-Sol, CCIP's exclusive distributor in Europe. During the

meeting, Kuraray offered to sell films comparable to those produced by CCIP at lower prices.

87.     Rossman was aware of CCIP's relationship with Manitoba. Moreover, before

Rossman left CCIP, Kuraray had never approached Manitoba. On information and belief,

Rossman shared with Kuraray confidential information of CCIP relating to Manitoba, and he

facilitated Kuraray' s contact with Manitoba.

### 5. **Emblematic Fabrics**

88.     Emblematic Fabrics ("Emblematic") is a distributor of backing material used in

embroidery applications for the fabric, textile, and sportswear industries. Emblematic is located

in New Jersey. In 1997, CCIP and Emblematic signed an exclusive distribution agreement.

89.     On or about July 31, 1998, Rossman and at least three Kuraray representatives,

including Fujita, met with Emblematic at its office in New Jersey. During the meeting, Kuraray

and Rossman solicited Emblematic to sever its ties with CCIP and to begin purchasing PVOH

film from Kuraray. As an additional incentive, Kuraray and Rossman offered to sell PVOH film

at prices substantially less than those charged by CCIP.

### 6. **DuPont Agricultural**

90.     Rossman and Kuraray also approached DuPont Agricultural and attempted to sell

it PVOH film. DuPont Agricultural was CCIP's largest agricultural packaging customer.

Rossman was intimately familiar with the details of this customer relationship. While serving as

CCIP's president, he was involved with the execution of the exclusive supply contract between CCIP and DuPont Agricultural, as well as the confidentiality agreement between CCIP and DuPont Agricultural.

### 7. Novartis

91. In or about August, 1998, Rossman and Kuraray approached Novartis in the United States. CCIP was the principal supplier of PVOH film to Novartis. Before Rossman left CCIP, on information and belief, Kuraray had never sold PVOH film to Novartis in the United States. Rossman knew the details of CCIP's relationship with Novartis. On information and belief, Rossman shared with Kuraray confidential information relating to Novartis and facilitated Kuraray's contact with Novartis.

### Disclosure of Confidential Information of Others.

92. Rossman also misused proprietary, confidential, trade secret CCIP information to form his new company, Cast Film. The computer records from Rossman's CCIP-provided personal computer demonstrate that Rossman breached his fiduciary duties to CCIP by using CCIP facilities, time and information to create a business plan for Cast Film which specifically contemplated competing against CCIP. In particular, Rossman's business plan for Cast Film employed confidential business information belonging to CCIP for purposes of creating Cast Film's start-up marketing and financial models. Rossman used his plan to seek financing for Cast Film.

93. While still the president of CCIP, Rossman gathered confidential, proprietary, trade secret information belonging to CCIP for the purpose of taking that information with him when he resigned from CCIP in order to compete against CCIP.

## CCIP Files Suit Against Cast Film, Kuraray and Rossman

94.     On November 16, 1998, CCIP filed a complaint for damages and injunctive relief against Kuraray in the United States District Court for the Northern District of Illinois, later adding Rossman and Cast Film as defendants. The case was assigned case number 98 C 7298 and was assigned to the Honorable James H. Alesia. CCIP's complaint alleged among other things misappropriation of its trade secrets and confidential information, RICO violations and RICO conspiracy, Lanham Act violations, civil conspiracy, tortious interference with customer relationships, and breach of fiduciary duty.

95.     On August 20, 2000, CCIP settled its claims against Kuraray.

96.     On August 28, 2000, CCIP settled its claims against Cast Film and Rossman. While the specific terms of the Settlement Agreement are confidential, Rossman and Cast Films were prohibited from soliciting CCIP's customers for a specified period of time.

## Rossman and Cast Film Fraudulently Induce CCIP to Settle Its Lawsuit

97.     While Rossman and Cast Film were negotiating with CCIP to settle the claims against them, Rossman and Cast Film were forming Cast Film LLC to compete with CCIP. Rossman owns an unknown interest in Cast Film LLC. Neither Rossman nor Cast Film disclosed the formation of Cast Film LLC to CCIP during settlement negotiations.

98.     As negotiations with CCIP continued, Cast Film LLC was forming a wholly owned subsidiary in the United Kingdom known as Cast Film Europe to compete with CCIP. Rossman also owns an unknown interest in Cast Film Europe. Again, neither Rossman nor Cast Film disclosed to CCIP the existence of Cast Film Europe.

99.     In order to ensure the protection of its valuable trade secret and confidential information, CCIP informed Rossman and Cast Film that as a basis for any settlement of its

lawsuit they must agree not to solicit certain CCIP customers for a defined period of time. Rossman and Cast Film agreed.

100.     While Rossman and Cast Film continued to negotiate in bad faith with CCIP, on information and belief, Rossman was negotiating to acquire Aquafilm, a competitor of CCIP.

101.     Unaware of Rossman's and Cast Film's plans to form Cast Film LLC and Cast Film Europe and to acquire Aquafilm to continue their illegal and unfair competition, including their assault on CCIP's customer base, CCIP settled its claims against Rossman and Cast Film on August 28, 2000.

**Rossman and Cast Film Breach The Settlement Agreement**

102.     Just three months after settling with CCIP, in December 2000, Cast Film Europe purchased Aquafilm. Rossman was named a director of the company on December 14, 2000.

103.     Through Aquafilm, Rossman and Cast Film actively solicited MonoSol customers in violation of the Settlement Agreement during 2000 and 2001.

**The Scheme to Steal MonoSol (f/k/a CCIP) Business and Trade Secrets Continues**

104.     Upon information and belief, at least as early as July 2001, while still employed as MonoSol's Technology Manager, Knoop joined the Cast Film/Rossman/Aquafilm conspiracy to steal the business and trade secrets of MonoSol.

105.     In approximately July 2001, Knoop upgraded his home internet access to a high speed DSL connection and purchased a high-end computer system that included the ability to write (burn) information to compact disks (CD's). Shortly thereafter, Knoop began systematically sending to his home from MonoSol premises, via email, vast amounts of secret and confidential technical information relating to, among other things, the ongoing work on MonoSol's new band casting Line 5.

106.    On or about July 2001, Knoop copied all Line 5 Project drawings on the MonoSol internal computer network relating to Line 5 and emailed the drawings to himself at home. Knoop also took hard copies of files, schematics, drawings and specifications home with him. Knoop used this information to burn, at home, a set of CD's containing a complete copy set of all confidential, secret and proprietary technical information relating to Line 5. Knoop showed these CD's and boasted of them to at least one MonoSol employee before his resignation was final.

107.    Since his resignation and as of the filing of this Complaint, Knoop has not returned any of these documents, or the set of CD's to MonoSol.

108.    Prior to his resignation, Knoop took home a copy of the specifications on a proprietary product made by MonoSol for its customer, Lever Brothers. At the time, Knoop had no legitimate business reason for obtaining this information. The information would be extremely valuable to any competitor of MonoSol trying to lure the business of this customer away from MonoSol. Shortly prior to his resignation, Knoop had in his office 20-30 rolls of samples of various products made by MonoSol. Shortly after Knoop's resignation, these samples were discovered to be missing. A search of the plant failed to locate the missing samples. On information and belief, Knoop stole the samples in furtherance of the defendants' conspiracy.

109.    Shortly prior to his resignation, Knoop emailed to himself at home the production protocols for every product manufactured by MonoSol. Given his job responsibilities at that time, he had no legitimate need for this information and particularly so in view of his imminent resignation. On information and belief, Knoop stole this information in furtherance of the defendants' conspiracy.

110. Shortly prior to his resignation, Knoop was in possession of several samples of a particularly crucial component of Line 5, provided by MonoSol's vendor, Berndorf Belt Systems, Inc. ("Berndorf".) The composition of this component is highly proprietary and plays a key role in the successful operation of Line 5. The composition of this component is susceptible to reverse engineering, and knowledge of this composition would be highly valuable to any competitor of MonoSol seeking to copy MonoSol's state of the art band casting line. Shortly after Knoop's resignation, these samples were discovered to be missing. A search of the plant failed to locate the missing samples. On information and belief, Knoop stole the samples in furtherance of the defendants' conspiracy.

111. Knoop had no direct responsibility for the electrical/control aspects of Line 5 Project. Nor can Knoop read technical electrical drawings and logic programs. However, shortly before his resignation, Knoop obtained all electrical, schematics, logic programs and other technical information relating to the control system of Line 5 from MonoSol's outside vendor which had created the control system under a duty of confidentiality to MonoSol according to MonoSol's confidential specifications. Since Knoop's resignation, substantial portions of this information has been discovered to be missing and has not been located. On information and belief, Knoop stole this information in furtherance of the defendants' conspiracy.

112. Berndorf is a consultant that provides services and products to the PVOH film industry. Berndorf is one of the vendors that supplied services and products to MonoSol in connection with MonoSol's development and installation of Line 5. In connection with this consultation, Berndorf provided three sets of operation and other manuals to MonoSol. Berndorf and MonoSol treat these manuals as confidential. Prior to his resignation, Knoop was in possession of one set. As of the date of the filing of this Complaint, Knoop's set of the Berndorf

manuals is missing. A search of the plant failed to locate the missing set of the manuals. On information and belief, Knoop stole this information in furtherance of the defendants' conspiracy.

113.    Berndorf also provided information to MonoSol via a computer disk. MonoSol agreed with Berndorf that it would not copy the contents of the disk. Altough he was informed that the Berndorf disk was not to be copied, Knoop copied the contents of this Berndorf disk to his hard drive on his office computer, and emailed the contents to his home. On information and belief, Knoop copied this information in furtherance of the defendants' conspiracy.

114.    In connection with the work on Line 5, MonoSol purchased one copy of TurboCad, a computer aided drawing software product. This was purchased to allow MonoSol to open, read and otherwise handle drawings provided by various third party vendors who often prepared drawings utilizing this software. As Project Manager, the TurboCad was installed on Knoop's MonoSol-provided computer. On several occasions, Knoop utilized TurboCad to falsify drawings to indicate that they were prepared by Knoop, when in fact they were the work of a co-worker or MonoSol vendor. Since Knoop's resignation from MonoSol, MonSol's copy of TurboCad is missing. A search of the plant failed to recover the missing software. On information and belief, Knoop stole the software in furtherance of the defendants' conspiracy.

115.    Knoop's misappropriation of MonoSol's trade secrets in August 2001 occurred almost simultaneously with the expiration of the term in the Settlement Agreement barring Cast Film and Rossman from contacting certain identified MonoSol customers.

116.    Before his resignation, Knoop confided to co-workers his belief that he was underpaid and under-appreciated. He also confided that he was resigning because he was not asked to be a partner in MonoSol when the management buy-out occurred.

117.    After announcing his resignation, MonoSol asked Knoop several questions designed to ascertain whether Knoop planned to work for or with Rossman in view of Rossman's history of stealing CCIP's confidential information. Knoop assured MonoSol that he had no intention to work for Rossman and that he had not spoken to Rossman. Knoop promised P. Scott Bening, MonoSol's CEO and President, that he (Knoop) would never work for Rossman.

118.    At the time of Knoop's exit interview from MonoSol, he was admonished of his continuing obligation to preserve the confidences of MonoSol and it was explained to him that it would not be possible for him to work for MonoSol's competitors without the danger that Knoop would inevitably disclose MonoSol's secrets to the competitor. MonoSol offered to make Knoop a paid consultant so that he would not suffer financially as he looked for a suitable position outside MonoSol's industry, but Knoop refused this offer.

119.    Knoop lied to MonoSol about his employment plans. He now is working for Rossman and Aquafilm. On information and belief, Knoop is responsible for the development and installation of new band casting lines for Aquafilm. Upon information and belief, at least one of the production lines for which Knoop is responsible is intended to be a state of the art band casting line for the production of polyvinyl alcohol ("PVOH") water-soluble films to be sold in competition against MonoSol. Knoop cannot discharge his responsibilities without inevitably misappropriating MonoSol's trade secrets relating to Line 5, MonoSol's proprietary products and other MonoSol business information. Knoop's attempted concealment of his employment at Aquafilm demonstrates that he understands that his very employment there imperils MonoSol's trade secrets.

120.    Rossman, Aquafilm and CastFilm have received and will inevitably continue to receive from Knoop, confidential and trade secret information of MonoSol, when they know, or

should know that the information is confidential and acquired by Knoop fraudulently. Thus, they have misappropriated MonoSol's trade secrets in violation of law.

121. Rossman, Aquafilm and CastFilm have and continue to induce Knoop to breach his Employee Confidential Information and Invention Agreement.

122. MonoSol lacks an adequate remedy at law for the violations alleged in this Complaint and will suffer irreparable injury if Rossman, Knoop, Aquafilm, and Cast Film are not enjoined.

123. Rossman's, Knoop's, Aquafilm's and Cast Film's conduct has been willful and wanton and in gross disregard of the law and the rights of MonoSol.

## COUNT I - FRAUDULENT INDUCEMENT TO SETTLE LAWSUIT

124. MonoSol realleges the allegations of paragraphs 1 through 123.

125. Rossman and Cast Film failed to disclose the formation of Cast Film LLC and Cast Film Europe in order to acquire Aquafilm to compete with CCIP. These facts would have been material to CCIP's decision to settle its claims against Rossman and Cast Film. Rossman and Cast Film knew these facts were material to CCIP's decision.

126. As part of its settlement with CCIP, Rossman and Cast Film agreed not to solicit certain CCIP customers for a defined period of time.

127. In order to induce CCIP to settle the Kuraray litigation, Rossman and Cast Film: (i) failed to disclose the formation of Cast Film LLC and Cast Film Europe and their intention to acquire Aquafilm; and (ii) agreed not to solicit certain CCIP customers.

128. CCIP relied on Rossman's and Cast Film's agreement not to solicit CCIP's customers and Rossman's and Cast Film's material omission to disclose the formation of Cast Film LLC and Cast Film Europe, for the purpose of acquiring Aquafilm.

129.    MonoSol has been damaged by Rossman's and Cast Film's fraudulent inducement of CCIP to settle the Kuraray litigation. MonoSol continues to be damaged as a result of CCIP's settlement of its claims against Rossman and Cast Film, while Rossman and Cast Film continue to solicit MonoSol's customers through Cast Film LLC and Aquafilm. As a result of Rossman's and Cast Film's fraudulent inducement, MonoSol seeks to have the Settlement Agreement voided and the claims reinstated against Rossman and Cast Films from the Kuraray litigation. Those original claims are re-pled herein as Conditional Counts III-XI, conditional on the Court's granting of MonoSol's request, via motion or otherwise, to void the Settlement Agreement and allow such re-pleading.

## COUNT II- BREACH OF SETTLEMENT AGREEMENT

130.    MonoSol realleges the allegations of paragraphs 1 through 129.

131.    Rossman and Cast Film entered into the Settlement Agreement with CCIP on August 28, 2000. The Settlement Agreement prohibits Rossman and Cast Film from soliciting, marketing or selling PVA films to specific MonoSol customers for a prescribed period of time.

132.    Rossman and Cast Film, throught agents, have breached the Settlement Agreement by soliciting, marketing or selling PVA films to prohibited third parties during the relevant time period through Aquafilm, Cast Film LLC, and Cast Film Europe.

133.    MonoSol has suffered damages as a result of Rossman's and Cast Film's breach of the Settlement Agreement.

## CONDITIONAL COUNT III – RICO § 1962(c)
### (Against Cast Film and Rossman)

134.    MonoSol realleges the allegations of paragraphs 1 through 133.

135.    From on or about November 1997, continuing through the filing of this Complaint, in the Northern District of Illinois and elsewhere, Kuraray Japan, Kuraray America

and Rossman were persons under RICO who agreed to and did conduct and participate in the affairs of an associated-in-fact enterprise engaging in, and the activities of which affect, interstate and foreign commerce. This enterprise is comprised of Rossman, Brucki, Cast Film, Kuraray America and Kuraray Japan.

136.    Kuraray Japan, Kuraray America and Rossman, for the purpose of executing and attempting to execute the scheme to defraud CCIP and steal its trade secret information, did and do unlawfully, willfully and knowingly conduct and participate, directly and indirectly, in the conduct of said enterprise's affairs through a pattern of racketeering activity. Their actions include: (i) wire fraud (18 U.S.C. §1343); (ii) shipment of stolen goods (18 U.S.C. § 2314); and (iii) receipt of stolen goods (18 U.S.C. § 2315).

137.    The enterprise as described herein is at all relevant times a continuing enterprise because, among other reasons, it is designed to and did unlawfully acquire the confidential trade secrets of CCIP and incorporate them into the ongoing business, marketing strategies and product plans of defendants Kuraray America and Kuraray Japan. The conduct of the enterprise continues through the date of this Complaint and is ongoing by virtue of defendants' continued use of CCIP's (n/k/a MonoSol) highly confidential, proprietary and trade secret information, all to the detriment of MonoSol.

138.    The pattern of racketeering activity, as defined by 18 U.S.C. § 1961(1) and (5), presents both a history of criminal conduct and a distinct threat of continuing criminal activity. Such activity consists of multiple acts of racketeering by each defendant herein, and is interrelated, not isolated. Such activity extends over a substantial period of time, up to and beyond the date of this Complaint. Such activities occurred after the effective date of 18 U.S.C. §

1961 et seq., and the last such act occurred within ten years after the commission of a prior act of racketeering activity. These racketeering activities included repeated acts of:

    (a)    <u>Wire Fraud</u>: On or about the dates indicated in the paragraphs incorporated below, defendants Kuraray Japan, Kuraray America and Rossman, aided and abetted by each other and Brucki and Cast Film, having devised a scheme or artifice to defraud CCIP of its confidential trade secret information by conversion, false representations, concealment and breaches of fiduciary duty, did for the purpose of furthering and executing such scheme or artifice to defraud, transmit and cause to be transmitted by means of wire communications in interstate or foreign commerce, writing, signs, signals, pictures or sound, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2, as previously described in this Complaint.

    (b)    <u>Interstate or Foreign Transportation of Stolen Goods</u>: On or about the dates indicated in the paragraphs incorporated below, defendants Kuraray Japan, Kuraray America and Rossman, aided and abetted by each other and Brucki and Cast Film, having devised or intending to devise a scheme or artifice to defraud CCIP of its confidential, proprietary information by means of false or fraudulent pretenses, representations or promises, transported or caused to be transported in interstate or foreign commerce in the execution or concealment of a scheme or artifice to defraud, confidential, proprietary property or information of plaintiff, having a value of $5,000 or more, in violation of 18 U.S.C. § 2314 and 18 U.S.C. § 2, as previously described in this Complaint.

    (c)    <u>Receipt of Stolen Goods</u>: On or about the dates indicated in the paragraphs incorporated below, Kuraray Japan, Kuraray America and Rossman, aided and

abetted by each other and Brucki and Cast Film, did receive, possess, conceal, store or dispose of goods of CCIP, which had crossed a State or United States boundary after being stolen, unlawfully converted or taken, knowing the same to have been stolen, unlawfully converted, or taken. Such goods include confidential, proprietary property or information, having a value of $5,000 or more. Such actions are in violation of 18 U.S.C. § 2315 and 18 U.S.C. § 2, as previously described in this Complaint.

139. Kuraray America, Kuraray Japan and Rossman, the persons alleged herein to have violated 18 U.S.C. § 1962(c), are separate from, though associated with, the RICO enterprise.

140. Kuraray America, Kuraray Japan and Rossman had a role in the racketeering activity that was distinct from the undertaking of those acting on its behalf. Kuraray America, Kuraray Japan and Rossman also attempted to benefit, and did benefit, from the activity of their employees and agents alleged herein, and thus were not passive victims of racketeering activity, but active perpetrators. Kuraray America and Kuraray Japan also knew that Rossman intended to and did breach his fiduciary duties to CCIP and aided and abetted these violations by giving him substantial assistance and encouragement to perform the breaches of duties alleged herein.

141. MonoSol has been injured in its business or property by reason of the RICO defendants' violations of 18 U.S.C. § 1962(c), including injury by reason of the predicate acts constituting the pattern of racketeering injury.

142. As a result of the violations of 18 U.S.C. § 1962(c) by Rossman and Cast Film, MonoSol has suffered substantial damages, in an amount to be proved at trial.

143.    Pursuant to 18 U.S.C. § 1964(c), MonoSol is entitled to recover treble its general and special compensatory damages, plus interest, costs and attorneys' fees, by reason of the RICO defendants' violation of 18 U.S.C. § 1962(c).

## CONDITIONAL COUNT IV- RICO § 1962(d)
### (Against Cast Film and Rossman)

144.    MonoSol realleges the allegations of paragraphs 1 through 143.

145.    From on or about November 1997, continuing through the filing of this Complaint, in the Northern District of Illinois and elsewhere, Kuraray Japan, Kuraray America and Rossman willfully, knowingly and unlawfully, did conspire, combine, confederate and agree together, and with various other persons whose names are both known and unknown, to violate18 U.S.C.'1962(c).

146.    Kuraray Japan, Kuraray America and Rossman agreed to participate and conduct the affairs of an enterprise engaged in, and the activities of which affect, interstate and foreign commerce. Specifically, Rossman, Brucki, Cast Film, Kuraray Japan and Kuraray America constituted a group of individuals and entities associated-in-fact as an enterprise. The RICO defendants willfully and knowingly agreed to participate in and conduct, directly and indirectly, said enterprise's affairs through a pattern of racketeering activity.

(a)    Acts of Wire Fraud, in violation of 18 U.S.C. § 1343 as previously described in this Complaint.

(b)    Acts of Interstate or Foreign Transportation of Stolen Goods, in violation of 18 U.S.C. § 2314, as previously set forth in this Complaint.

(c)    Acts of Receiving Stolen Goods, in violation of 18 U.S.C. § 2315, as previously set forth in this Complaint.

147.    The pattern of racketeering activity, as defined by 18U.S.C. § 1961(1) and (5) included:In furtherance of this unlawful conspiracy, and to effect its objectives, the RICO defendants and various co-conspirators committed numerous overt acts, including but not limited to those previously set forth in this Complaint.

148.    MonoSol has been injured in its business or property by reason of the RICO defendants' violation of 18 U.S.C. § 1962(d), including injury by reason of the predicate acts constituting the pattern of racketeering injury.

149.    As a result of the conspiracies between and among the RICO defendants to violate 18 U.S.C. § 1962(c), MonoSol has suffered substantial damages, in an amount to be proved at trial.

150.    Pursuant to 18 U.S.C. § 1964(c), MonoSol is entitled to recover treble its general and special compensatory damages, plus interest, costs and attorneys' fees, by reason of the RICO defendants' violation of 18 U.S.C. § 1962(d).

## CONDITIONAL COUNT V -MISAPPROPRIATION OF TRADE SECRETS
### (Against Rossman)

151.    MonoSol realleges the allegations of paragraphs 1 through 150.

152.    Rossman has misappropriated trade secrets in violation of the Illinois Trade Secrets Act by disclosing and using for his own benefit confidential information belonging to CCIP. Due to the nature of the relationship between Rossman, Cast Film and Kuraray, it is inevitable that Rossman will continue to breach his duty to preserve the confidentiality of CCIP's trade secrets.

153.    The CCIP information misappropriated by Rossman was the subject of reasonable measures to protect its secrecy.

154.    The confidential information misappropriated by Rossman was unique to CCIP and not generally known in the industry. At least a significant part of its value derives from the fact that it is not generally known within the industry.

155.    CCIP has suffered damages and will imminently suffer further damages, including the loss of its proprietary information and competitive information, in an amount to be proved at trial.

156.    CCIP will also suffer irreparable injury and lacks an adequate remedy at law if Rossman is not enjoined against further or continuing misappropriation of CCIP's trade secrets.

157.    Rossman's misappropriation of CCIP's trade secrets has been wanton and with malice.

### CONDITIONAL COUNT VI- MISAPPROPRIATION OF TRADE SECRETS
### (Against Cast Film)

158.    MonoSol realleges the allegations of paragraphs 1 through 157.

159.    Cast Film has misappropriated trade secrets in violation of the Illinois Trade Secrets Act by disclosing and using for its own benefit confidential information belonging to CCIP. In addition, Cast Film's activities have produced an inevitable breach of Rossman's duty to maintain the secrecy of CCIP's trade secrets. Due to the nature of the relationship between Rossman, Cast Film and Kuraray, it is inevitable that Rossman will continue to breach his duty to preserve the confidentiality of CCIP's trade secrets.

160.    The CCIP information misappropriated by Cast Film was the subject of reasonable measures to protect its secrecy.

161.     The confidential information misappropriated by Cast Film was unique to CCIP and not generally known in the industry. At least a significant part of its value derives from the fact that it is not generally known within the industry.

162.     CCIP has suffered damages and will imminently suffer further damages, including the loss of its proprietary and competitive information, in an amount to be proved at trial.

163.     CCIP will also suffer irreparable injury and lacks an adequate remedy at law if Cast Film is not enjoined against further or continuing misappropriation of CCIP's trade secrets.

164.     Cast Film's misappropriation of CCIP's trade secrets has been wanton and with malice.

## CONDITIONAL COUNT VII- TORTIOUS INTERFERENCE
## WITH CUSTOMER RELATIONSHIPS
### (Against Rossman)

165.     MonoSol realleges the allegations of paragraphs 1 through 164.

166.     Rossman has attempted and is continuing to attempt to induce DuPont, Emblematic, Novartis, Du.Pont Agricultural Products Division, Bush Industries, Bush Viotech, Jeyes, Manitoba and other CCIP customers to terminate their relationships with CCIP or to unlawfully divert business from CCIP to Rossman, Cast Film or Kuraray.

167.     CCIP's relationship with its customers, including DuPont, Emblematic, Novartis, DuPont Agricultural Products Division, Bush Industries, Bush Viotech, Jeyes and Manitoba, is well known to Rossman and of great value to CCIP.

168.     Rossman is not engaging in fair competition by attempting to induce CCIP customers to end their relationship with CCIP or to divert business from CCIP. Rather, Rossman has used unlawful means, including misappropriation of trade secrets and breach of fiduciary

duties, to attempt to induce CCIP customers to terminate their relationship with CCIP or to divert business from CCIP. Moreover, Rossman is engaged in an unlawful civil conspiracy to induce DuPont, Emblematic, Novartis, DuPont Agricultural Products Division, Bush Industries, Bush Viotech, Jeyes and Manitoba, and other CCIP customers to terminate their relationship with CCIP in favor of a new relationship with Cast Film or Kuraray, or to otherwise unlawfully divert business from CCIP.

169. CCIP has suffered damages as a result of Rossman's tortious interference with CCIP's customer relationships.

170. CCIP will suffer irreparable injury and has no adequate means at law to protect it against Rossman's tortious interference with CCIP's customer relationships.

171. Rossman' s tortious interference with CCIP's customer relationships has been wanton and with malice.

### CONDITIONAL COUNT VIII- TORTIOUS INTERFERENCE WITH CUSTOMER RELATIONSHIPS
#### (Against Cast Film)

172. MonoSol realleges the allegations of paragraphs 1 through 171.

173. Cast Film has attempted and is continuing to attempt to induce DuPont, Emblematic, Novartis, DuPont Agricultural Products Division, Bush Industries, Bush Viotech, Jeyes, Manitoba and other CCIP customers to terminate their relationships with CCIP or to unlawfully divert business from CCIP to Cast Film or Kuraray.

174. CCIP's relationship with its customers, including DuPont, Emblematic, Novartis, DuPont Agricultural Products Division, Bush Industries, Bush Viotech, Jeyes and Manitoba, and other CCIP customers is well known to Cast Film and of great value to CCIP.

175.    Cast Film is not engaging in fair competition by attempting to induce CCIP customers to end their relationship with CCIP or to divert business from CCIP. Rather, Cast Film has used unlawful means, including misappropriation of trade secrets and breach of fiduciary duties, to attempt to induce CCIP customers to terminate their relationship with CCIP or to divert business from CCIP. Moreover, Cast Film is engaged in an unlawful civil conspiracy to induce CCIP customers to terminate their relationship with CCIP in favor of a new relationship with Cast Film or Kuraray, or to divert business from CCIP.

176.    CCIP has suffered damages as a result of Cast Film's tortious interference with CCIP's customer relationships.

177.    CCIP will suffer irreparable injury and has no adequate means at law to protect it against Cast Film's tortious interference with CCIP's customer relationships.

178.    Cast Film's tortious interference with CCIP's customer relationships has been wanton and with malice.

## CONDITIONAL COUNT IX - BREACH OF CONFIDENTIALITY AGREEMENT
### (Against Rossman)

179.    MonoSol realleges the allegations of paragraphs I through 178.

180.    As president of CCIP, Rossman signed a Confidentiality Agreement with CCIP. Rossman's Confidentiality Agreement is attached to this Complaint as Exhibit A.

181.    Exhibit A provides, in pertinent part:

> [E]mployee shall not disclose or use at any time either during or subsequent to said employment, any secret or confidential information of Employer of which Employee becomes informed during said employment, whether or not developed by Employee, except as required in Employee's duties to Employer.

> (Exhibit A, & 1.)

182. Rossman has breached his Confidentiality Agreement with CCIP by disclosing confidential information to, among others, Kuraray and by using CCIP confidential information for his own benefit, contrary to the interests of CCIP.

183. CCIP has suffered damages as a result of Rossman's breach of his Confidentiality Agreement.

184. Rossman's breach of his Confidentiality Agreement has been wanton and with malice.

## CONDITIONAL COUNT X - BREACH OF FIDUCIARY DUTIES
### (Against Rossman)

185. MonoSol realleges the allegations of paragraphs 1 through 184.

186. As president of CCIP, Rossman held a duty of loyalty to CCIP.

187. Rossman breached his duty of loyalty to CCIP while he was president of following ways:

(a) Rossman conspired with Polymer Films and ENAK, both competitors of CCIP, to attempt to form a consortium to purchase Aquafilm at a time when Rossman knew that CCIP itself was investigating an acquisition of Aquafilm;

(b) While still president of CCIP, Rossman prepared a business plan for the company that eventually became known as Cast Film which incorporated confidential, proprietary, trade secret information belonging to CCIP. Rossman then used that business plan to attempt to obtain financing for Cast Film while Rossman was still the president of CCIP;

(c) Rossman used his position as president of CCIP to gather confidential,

proprietary trade secret information relating to CCIP's consumption and use of resins for PVOH water-soluble film and information relating to CCIP's special technical know-how for the manufacture of PVOH water-soluble films. Rossman sought that information only for illegitimate purposes, namely to compete against CCIP after his resignation from CCIP.

188.    CCIP has suffered damages as a result of Rossman's breach of his fiduciary duties.

189.    Rossman's breach of his fiduciary duties has been wanton and with malice.

## CONDITIONAL COUNT XI- CIVIL CONSPIRACY
### (Against Rossman and Cast Film)

190.    MonoSol realleges the allegations of paragraphs 1 through 189.

191.    Rossman and Cast Film have engaged in an unlawful civil conspiracy with Kuraray Japan and Kuraray America to compete unlawfully against CCIP. In particular, Rossman and Cast Film have conspired to unlawfully use CCIP confidential, proprietary trade secret information to tortiously interfere with CCIP's longstanding relationship with its customer DuPont.

192.    Rossman has made overt acts in furtherance of the conspiracy in that he:

(a)    Attempted to hide the conspiracy by destroying evidence and deleting documents from the personal computer supplied to him by CCIP;

(b)    Met with Kuraray in Japan and America both before and after he resigned as president of CCIP for purposes of plotting against CCIP;

(c)    Provided sample films from CCIP to Kuraray in order to enable Kuraray to analyze and compare CCIP's PVOH water-soluble films for purposes of selecting Kuraray films that could be modified to compete against

CCIP's films; and

(d)     Established Cast Film as a corporation to compete against CCIP, while he was still president of CCIP, using confidential CCIP information in order to obtain financing for Cast Film's part of the unlawful civil conspiracy.

193.    CCIP has suffered damages as a result of Rossman's and Cast Film's unlawful civil conspiracy with Kuraray.

194.    CCIP lacks an adequate remedy at law and will suffer irreparable injury if Rossman and Cast Film's unlawful civil conspiracy with Kuraray is not enjoined.

195.    Rossman and Cast Film's conduct have been wanton and with malice.

## COUNT XII – RICO § 1962(c)

196.    MonoSol realleges the allegations of paragraphs 1 through 195.

197.    From on or about November 1997, continuing through the filing of this Complaint, in the Northern District of Illinois and elsewhere, Rossman, Aquafilm, Cast Film, and Knoop were persons under RICO who agreed to and did conduct and participate in the affairs of an associated-in-fact enterprise engaging in, and the activities of which affect, interstate and foreign commerce. This enterprise is comprised of Rossman, Brucki, Cast Film, Aquafilm, Kuraray America, Kuraray Japan and Knoop.

198.    Rossman, Aquafilm, Cast Film, and Knoop, for the purpose of executing and attempting to execute the scheme to defraud MonoSol (f/k/a CCIP) and steal its trade secret information, did and do unlawfully, willfully and knowingly conduct and participate, directly and indirectly, in the conduct of said enterprise's affairs through a pattern of racketeering activity. Their actions including wire fraud (18 U.S.C. § 1343).

199.    The enterprise as described herein is at all relevant times a continuing enterprise because, among other reasons, it is designed to and did unlawfully acquire the confidential trade secrets of MonoSol and incorporate them into the ongoing business, marketing strategies and product plans of defendants Rossman, Aquafilm and Cast Film. The conduct of the enterprise continues through the date of this Complaint and is ongoing by virtue of defendants' continued use of MonoSol's (f/k/a CCIP) highly confidential, proprietary and trade secret information, all to the detriment of MonoSol.

200.    The pattern of racketeering activity, as defined by 18 U.S.C. § 1961(1) and (5),

201.    presents both a history of criminal conduct and a distinct threat of continuing criminal activity.  Such activity consists of multiple acts of racketeering by each defendant herein, and is interrelated, not isolated. Such activity extends over a substantial period of time, up to and beyond the date of this Complaint. Such activities occurred after the effective date of 18 U.S.C. § 1961 et seq., and the last such act occurred within ten years after the commission of a prior act of racketeering activity. These racketeering activities included repeated acts of:

(a)    Wire Fraud: On or about the dates indicated in the paragraphs incorporated below, defendants Rossman, Aquafilm, Cast Film, and Knoop, aided and abetted by each other and Brucki, Kararay America and Karary Japan, having devised a scheme or artifice to defraud MonoSol of its confidential trade secret information by conversion, false representations, concealment and breaches of fiduciary duty, did for the purpose of furthering and executing such scheme or artifice to defraud, transmit and cause to be transmitted by means of wire communications in interstate or foreign commerce, writing, signs, signals, pictures or sound,

in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2, as previously described in this Complaint.

202.    Rossman, Aquafilm, Cast Film, and Knoop, the persons alleged herein to have violated 18 U.S.C. § 1962(c), are separate from, though associated with, the RICO enterprise.

203.    Rossman, Aquafilm, Cast Film, and Knoop had a role in the racketeering activity that was distinct from the undertaking of those acting on its behalf. Rossman, Aquafilm, Cast Film, and Knoop also attempted to benefit, and did benefit, from the activity of their employees and agents alleged herein, and thus were not passive victims of racketeering activity, but active perpetrators. Rossman, Aquafilm and Cast Film also knew that Knoop intended to and did breach his duties to MonoSol and aided and abetted these violations by giving him substantial assistance and encouragement to perform the breaches of duties alleged herein.

204.    MonoSol has been injured in its business or property by reason of the violations of 18 U.S.C. § 1962(c) alleged in this Count XII, including injury by reason of the predicate acts constituting the pattern of racketeering injury.

205.    As a result of the violations of 18 U.S.C. § 1962(c) by the RICO defendants of this Count XII, MonoSol has suffered substantial damages, in an amount and type to be proved at trial.

206.    Pursuant to 18 U.S.C. § 1964(c), MonoSol is entitled to recover treble its general and special compensatory damages, plus interest, costs and attorneys' fees, by reason of the RICO defendants' violation of 18 U.S.C. § 1962(c).

### COUNT XIII - MISAPPROPRIATION OF TRADE SECRETS (Against Knoop)

207.    MonoSol realleges the allegations of paragraphs 1 through 206.

Knoop has misappropriated trade secrets in violation of the Indiana Trade Secrets Act by disclosing and using for his own benefit confidential information belonging to MonoSol. Due to the nature of the relationship between Rossman, Cast Film, and Aquafilm it is inevitable that Knoop will continue to breach his duty to preserve the confidentiality of MonoSol's trade secrets.

208.    The MonoSol information misappropriated by Knoop was the subject of reasonable measures to protect its secrecy.

209.    The confidential information misappropriated by Knoop was unique to MonoSol and not generally known in the industry. At least a significant part of its value derives from the fact that it is not generally known within the industry.

210.    MonoSol faces a continuing threat of misappropriation of its confidential information by Knoop.

211.    Given that Knoop's responsibilities for Aquafilm are nearly identical to his responsibilities as Project Manager of Line 5 for MonoSol, it is inevitable that Knoop must use, rely on, and otherwise disclose MonoSol's confidential information to perform his duties for Aquafilm.

212.    MonoSol has suffered damages and will imminently suffer further damages, including the loss of its proprietary information and competitive information, in an amount to be proved at trial.

213.    MonoSol will also suffer irreparable injury and lacks an adequate remedy at law if Knoop is not enjoined against further of continuing misappropriation of MonoSol's trade secrets.

214.    Knoop' s misappropriation of MonSol's trade secrets has been wanton and with malice.

## COUNT XIV - BREACH OF
## CONFIDENTIALITY AGREEMENT
### (Against Knoop)

215.    MonoSol realleges the allegations of paragraphs I through 214.

216.    As an employee of MonoSol, Knoop signed a Confidentiality Agreement with

Knoop's Confidentiality Agreement is attached to this Complaint as Exhibit B.

217.    **Exhibit B** provides, in pertinent part:

218.    Knoop has breached his Confidentiality Agreement with MonoSol by disclosing

information to, among others, Rossman, Aquafilm, and Cast Film, by inevitably disclosing

confidential information to, among others, Rossman, Aquafilm and Cast Film, by creating an

ongoing threat of disclosing confidential information to, among others, Rossman, Aquafilm and

Cast Film, by using MonoSol confidential information for his own benefit, contrary to the

interests of MonoSol, and by failing to promptly deliver to MonoSol upon his termination

materials of a secret or confidential nature relating to MonoSol' s business and that are in the

possession or control of Knoop.

219.    MonoSol has suffered, continues to suffer and will suffer damages as a result of

Knoop's breach of his Confidentiality Agreement.

## COUNT XV -MISAPPROPRIATION
## OF TRADE SECRETS
### (Against Rossman)

220.    MonoSol realleges the allegations of paragraphs 1 through 219.

221.    Rossman, has misappropriated trade secrets in violation of the Indiana Trade

Secrets Act by aquiring and using and by inevitably aquiring and inevitably using for his own

benefit, from Knoop, confidential information belonging to MonoSol, when he knew or had

reason to know that the confidential information was aquired by improper means. Due to the

nature of the relationship between Rossman, Cast Film, Aquafilm, Knoop and MonoSol it is inevitable that Rossman, will continue to misappropriate MonoSol' s trade secrets.

222. The MonoSol information misappropriated by Rossman, was the subject of reasonable measures to protect its secrecy. The confidential information misappropriated by Rossman, is unique to MonoSol and not generally known in the industry. At least a significant part of its value derives from the fact that it is not generally known within the industry.

223. MonoSol faces a continuing threat of misappropriation of its confidential information by Rossman.

224. Given that Knoop's responsibilities for Aquafilm are nearly identical to his responsibilities as Project Manager of Line 5 for MonoSol, it is inevitable that Rossman, will misappropriate MonoSol's confidential information as Knoop continues to perform his duties for Aquafilm.

225. MonoSol has suffered damages and will imminently suffer further damages, including the loss of its proprietary information and competitive information, in an amount to be proved at trial.

226. MonoSol will also suffer irreparable injury and lacks an adequate remedy at law if enjoined against further of continuing misappropriation of MonoSol' s trade secrets.

227. Rossman's misappropriation of MonSol's trade secrets has been wanton and with malice.

## COUNT XVI - MISAPPROPRIATION
### OF TRADE SECRETS
### (Against Aquafilm)

228. MonoSol realleges the allegations of paragraphs 1 through 227.

229. Aquafilm has misappropriated trade secrets in violation of the Indiana Trade Secrets Act by aquiring and using and by inevitably aquiring and inevitably using for its own benefit, from Knoop, confidential information belonging to MonoSol, when Aquafilm knew or had reason to know that the confidential information was aquired by improper means. Due to the nature of the relationship between Rossman, Cast Film, Aquafilm, Knoop and MonoSol it is inevitable that Aquafilm will continue to misappropriate MonoSol' s trade secrets.

230. The MonoSol information misappropriated by Aquafilm is the subject of reasonable measures to protect its secrecy. The confidential information misappropriated by Aquafilm is unique to MonoSol and not generally known in the industry. At least a significant part of its value derives from the fact that it is not generally known within the industry.

231. MonoSol faces a continuing threat of misappropriation of its confidential information by Aquafilm.

232. Given that Knoop's responsibilities for Aquafilm are nearly identical to his responsibilities as Project Manager of Line 5 for MonoSol, it is inevitable that Aquafilm will misappropriate MonoSol's confidential information as Knoop continues to perform his duties for Aquafilm.

233. MonoSol has suffered damages and will imminently suffer further damages, including the loss of its proprietary information and competitive information, in an amount to be proved at trial.

234. MonoSol will also suffer irreparable injury and lacks an adequate remedy at law if enjoined against further of continuing misappropriation of MonoSol' s trade secrets.

235. Aquafilm's misappropriation of MonSol's trade secrets has been wanton and with malice.

## COUNT XVII -MISAPPROPRIATION
## OF TRADE SECRETS
### (Against Cast Film)

236.    MonoSol realleges the allegations of paragraphs 1 through 235.

237.    Cast Film has misappropriated trade secrets in violation of the Indiana Trade

Secrets Act by aquiring and using and by inevitably aquiring and inevitably using for its own

benefit, from Knoop, confidential information belonging to MonoSol, when Cast Film knew or

had reason to know that the confidential information was aquired by improper means. Due to the

nature of the relationship between Rossman, Cast Film, Aquafilm, Knoop and MonoSol it is

inevitable that Cast Film will continue to misappropriate MonoSol' s trade secrets.

238.    The MonoSol information misappropriated by Cast Film is the subject of

reasonable measures to protect its secrecy. The confidential information misappropriated by Cast

Film is unique to MonoSol and not generally known in the industry. At least a significant part of

its value derives from the fact that it is not generally known within the industry.

239.    MonoSol faces a continuing threat of misappropriation of its confidential

information by Cast Film.

240.    Given that Knoop's responsibilities for Aquafilm are nearly identical to his

responsibilities as Project Manager of Line 5 for MonoSol, it is inevitable that Cast Film will

misappropriate MonoSol's confidential information as Knoop continues to perform his duties for

Aquafilm.

241.    MonoSol has suffered damages and will imminently suffer further damages,

including the loss of its proprietary information and competitive information, in an amount to be

proved at trial.

242.     MonoSol will also suffer irreparable injury and lacks an adequate remedy at law if enjoined against further of continuing misappropriation of MonoSol's trade secrets.

243.     Cast Film's misappropriation of MonSol's trade secrets has been wanton and with malice.

## COUNT XVIII- TORTIOUS INTERFERENCE WITH KNOOP CONFIDENTIALITY AGREEMENT
### (Against Rossman)

244.     MonoSol realleges the allegations of paragraphs 1 through 243.

245.     As part of his employment, Knoop signed a valid and enforceable confidentiality agreement with MonoSol.

246.     Knoop's Confidentiality Agreement provides, in pertinent part:

> [E]mployee shall not disclose or use at any time either during or subsequent to said employment, any secret or confidential information of Employer of which Employee becomes informed during said employment, whether or not developed by Employee, except as required in Employee's duties to Employer.  (**Exhibit B** at 1)

and

> Upon termination of said employment, Employee shall promptly deliver to Employer all drawings, blueprints, manuals, letters, notes, notebooks, reports, and all other materials of a secret or confidential nature relating to Employer's business and which are in the possession or under the control of Employee. (**Exhibit B**, at 4.)

247.     Rossman was aware of Knoop's confidentiality agreement with MonoSol.

248.     For his own benefit, Rossman has induced and continues to induce Knoop to break his confidentiality agreement with MonoSol so that he can obtain the commercially valuable confidential information of MonoSol.

249.    Knoop has breached and will continue to breach his confidentiality agreement by disclosing confidential information relating to MonoSol's business to Rossman and others, to the benefit of the Rossman.

250.    MonoSol has suffered damages and will imminently suffer further damages, including the loss of its proprietary information and competitive information, in an amount to be proved at trial as a result of this tortious interference.

251.    MonoSol will also suffer irreparable injury and lacks an adequate remedy at law if Rossman is not enjoined against further and continuing inducement of Knoop's breach of his confidentiality agreement with MonoSol.

252.    Rossman's inducement has been and continues to be wanton and with malice.

## COUNT XIX- TORTIOUS INTERFERENCE WITH
## KNOOP CONFIDENTIALITY AGREEMENT
### (Against Aquafilm)

253.    MonoSol realleges the allegations of paragraphs 1 through 252.

254.    As part of his employment, Knoop signed a valid and enforceable confidentiality agreement with MonoSol.

255.    Knoop's Confidentiality Agreement provides, in pertinent part:

> [E]mployee shall not disclose or use at any time either during or subsequent to said employment, any secret or confidential information of Employer of which Employee becomes informed during said employment, whether or not developed by Employee, except as required in Employee's duties to Employer. **(Exhibit B at 1)**

and

> Upon termination of said employment, Employee shall promptly deliver to Employer all drawings, blueprints, manuals, letters, notes, notebooks, reports, and all other materials of a secret or confidential nature relating to Employer's business and which are in the possession or under the control of Employee. **(Exhibit B, at 4.)**

256.     Aquafilm was aware of Knoop's confidentiality agreement with MonoSol.

257.     For his own benefit, Aquafilm has induced and continues to induce Knoop to break his confidentiality agreement with MonoSol so that he can obtain the commercially valuable confidential information of MonoSol.

258.     Knoop has breached and will continue to breach his confidentiality agreement by disclosing confidential information relating to MonoSol's business to Aquafilm and others, to the benefit of the Aquafilm.

259.     MonoSol has suffered damages and will imminently suffer further damages, including the loss of its proprietary information and competitive information, in an amount to be proved at trial as a result of this tortious interference.

260.     MonoSol will also suffer irreparable injury and lacks an adequate remedy at law if Aquafilm is not enjoined against further and continuing inducement of Knoop's breach of his confidentiality agreement with MonoSol.

261.     Aquafilm's inducement has been and continues to be wanton and with malice.

## COUNT XX- TORTIOUS INTERFERENCE WITH KNOOP CONFIDENTIALITY AGREEMENT
### (Against Cast Film)

262.     MonoSol realleges the allegations of paragraphs 1 through 261.

263.     As part of his employment, Knoop signed a valid and enforceable confidentiality agreement with MonoSol.

264.     Knoop's Confidentiality Agreement provides, in pertinent part:

[E]mployee shall not disclose or use at any time either during or subsequent to said employment, any secret or confidential information of Employer of which Employee becomes informed during said employment, whether or not developed by Employee, except as required in Employee's duties to Employer. **(Exhibit B at 1)**

and

> Upon termination of said employment, Employee shall promptly deliver to Employer all drawings, blueprints, manuals, letters, notes, notebooks, reports, and all other materials of a secret or confidential nature relating to Employer's business and which are in the possession or under the control of Employee. **(Exhibit B**, at 4.)

265.    Cast Film was aware of Knoop's confidentiality agreement with MonoSol.

266.    For his own benefit, Aquafilm has induced and continues to induce Knoop to break his confidentiality agreement with MonoSol so that he can obtain the commercially valuable confidential information of MonoSol.

267.    Knoop has breached and will continue to breach his confidentiality agreement by disclosing confidential information relating to MonoSol's business to Cast Film and others, to the benefit of the Cast Film.

268.    MonoSol has suffered damages and will imminently suffer further damages, including the loss of its proprietary information and competitive information, in an amount to be proved at trial as a result of this tortious interference.

269.    MonoSol will also suffer irreparable injury and lacks an adequate remedy at law if Cast Film is not enjoined against further and continuing inducement of Knoop's breach of his confidentiality agreement with MonoSol.

270.    Cast Film's inducement has been and continues to be wanton and with malice.

### COUNT XVII- CIVIL CONSPIRACY
**(Against Rossman, Knoop, Aquafilm and Cast Film)**

271.    MonoSol realleges the allegations of paragraphs 1 through 270.

272.    Rossman, Knoop, Aquafilm and Cast Film have engaged in an unlawful civil conspiracy compete unlawfully against CCIP. In particular, Rossman, Knoop, Aquafilm and Cast

Film have conspired to unlawfully compete with MonoSol by stealing MonoSol's trade secrets and other confidential information and using same to improperly compete against MonoSol.

273.    In furtherance of the conspiracy, Knoop has, *inter alia*, acquired and otherwise obtained, without authority, valuable confidential information belonging to MonoSol and various of its vendors, has disclosed said valuable confidential information to others, and will inevitably disclose said confidential information to others.

274.    MonoSol has suffered damages as a result of the unlawful conspiracy among Rossman, Knoop, Aquafilm and Cast Film.

275.    MonoSol lacks an adequate remedy at law and will suffer irreparable injury if this unlawful civil conspiracy is not enjoined.

276.    The conduct of Rossman, Knoop, Aquafilm and Cast Film has been wanton and with malice.

### **RELIEF SOUGHT**

WHEREFORE, MonoSol asks this Court to award it the following relief:

277.    Under Count I, voiding of the Settlement Agreement and reinstatement of CCIP's claims that were released by CCIP as a result of Rossman's and Cast Film's fraudulent inducement.

278.    Under Count II, actual damages and costs of suit, including reasonable attorneys' fees in an amount to be determined at trial. MonoSol reasonably estimates these amounts to total in excess of $20 million.

279.    Under Counts III and IV, treble damages and costs of suit, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c). MonoSol reasonably estimates these amounts to total in excess of $20 million before trebling.

280. Under Counts V-XI, actual damages and costs of suit, including reasonable attorneys' fees, in an amount to be determined at trial. MonoSol reasonably estimates these amounts to total in excess of $20 million.

281. Under Counts V-XI, punitive damages to the extent available under law for defendants' willful and wanton misconduct in an amount to be determined at trial. MonoSol reasonably estimates these amounts to total in excess of $50 million.

282. Under all counts, a preliminary and permanent injunction:

(a) Enjoining both Aquafilm and Cast Film from seeking, receiving, using or disclosing any trade secrets or confidential information of MonoSol that Rossman or Knoop acquired during the course of or arising out of their employment by CCIP or MonoSol;

(b) Enjoining Rossman from disclosing or using any trade secrets or confidential information of MonoSol that Rossman acquired during the course of or arising out of his employment by CCIP;

(c) Enjoining Knoop from working for Aquafilm or Cast Film for a term of 5 years;

(d) Enjoining Aquafilm, Cast Film or those acting in concert with it from building a band casting line for a term of 5 years, except under clean room conditions excluding participation by any person who has had contact with Knoop;

(e) Enjoining all defendants from directly or indirectly selling to, servicing, calling on, or soliciting any of MonoSol's customers, including CCIP customers and potential CCIP customers with whom Rossman had direct or

indirect contact during the twenty-four months immediately prior to the termination of Rossman's employment with CCIP, for the purpose of selling products which are the same as, similar to, or competitive with products sold by MonoSol;

(f) Enjoining all defendants from offering employment to any current MonoSol employee or any former employee of MonoSol or its predecessor CCIP who has terminated his or her employment with MonoSol or CCIP within the past twenty-four months or any consultant who has consulted with MonoSol or CCIP within the last twenty-four months.

283.    Pre-judgment and post-judgment interest to the greatest extent permitted by law.

284.    Such other relief as this Court deems just.

MONOSOL L.L.C.

Dated: __3/5/02__          By: _____

Bradford P. Lyerla
Jeffrey R. Gargano
Austin J. Foley
Wallenstein & Wagner, Ltd.
311 South Wacker Drive, 53rd Floor
Chicago, Illinois 60606
(312) 554-3300 (Voice)
(312) 554-3301 (Fax)

# SEE CASE FILE FOR EXHIBITS

JS 44 (Rev. 7/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**DOCKETED**

## I. (a) PLAINTIFFS
MonoSol, L.L.C.
1701 County Line Road
Portage, IN 46368

*Cat 2*

### DEFENDANTS
Cast Film Technology, Inc.   c/o Bruce N. Tinkel
413 East Main Road
Barrington, IL 60010
SEE ATTACHMENT TO CIVIL COVER SHEET PART I.(a)

**MAR 0 6 2002**

**(b)** County of Residence of First Listed   Porter
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**JUDGE HIBBLER**

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Bradford P. Lyerla
Wallenstein & Wagner, Ltd.
311 South Wacker Drive, 53rd Floor
Chicago, Illinois 60606   (312) 554-3300
(SEE ATTACHMENT I.(c))

Attorneys (If Known)

**MAGISTRATE JUDGE
GERALDINE SOAT BROWN**

**02C 1611**

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government
Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties
in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | **PERSONAL INJURY** ☐ 362 Personal Injury— Med. Malpractice | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | | ☐ 365 Personal Injury— Product Liability | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☒ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** ☐ 370 Other Fraud | ☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 790 Other Labor Litigation | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)

18 U.S.C. 1961 et. seq.   RICO and Trade Secret Misappropriation

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE  James H. Alesia

DOCKET NUMBER  98C 7298

DATE  3/5/02

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT #_____ AMOUNT_____ APPLYING IFP_____ JUDGE_____ MAG. JUDGE_____

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MONOSOL, L.L.C.,                                )
                                               )
        **Plaintiff,**                       )
                                               )
      v.                                     )
                                               )
CAST FILM TECHNOLOGY, INC.,                     )
AQUAFILM, L.L.C., HENRY E. KNOOP )
and JAMES M. ROSSMAN,                           )
                                               )
        **Defendants.**                     )

JUDGE HIBBLER

Civil Action No. **02C 1611**

MAGISTRATE JUDGE
GERALDINE SOAT BROWN

## ATTACHMENT TO CIVIL COVER SHEET

### ATTACHMENT I.(b)

### Additional Defendants:

Aquafilm, L.L.C.
c/o Richard A. Jacobson
501 East Kennedy Boulevard, Suite 1700
Tampa, FL 33602

Henry E. Knoop                          c/o Aquafilm, L.L.C
511 Glade Place                         7455 Adamo Drive
Valparaiso, IN 46383                    Tampa, FL 33619

James M. Rossman
150 Red Top Drive
Libertyville, IL 60048

## ATTACHMENT I.(c)

## Additional Attorneys for Plaintiff

Jeffrey R. Gargano
WALLENSTEIN & WAGNER, LTD.
311 South Wacker Drive, 53rd Floor
Chicago, Illinois 60606-6622
(312) 554-3300


Austin J. Foley
WALLENSTEIN & WAGNER, LTD.
311 South Wacker Drive, 53rd Floor
Chicago, Illinois 60606-6622
(312) 554-3300


(141528)

# U̅TED STATES DISTRICT CO̅T
# NORTHERN DISTRICT OF ILLINOIS

In the Matter of

MONOSOL, L.L.C.

v.

CAST FILM TECHNOLOGY, INC., AQUAFILM, L.L.C., HENRY E. KNOOP AND JAMES M. ROSSMAN

DOCKETED

MAR 0 6 2002

Case Number 02C 1611



JUDGE HIBBLER

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

MAGISTRATE JUDGE
MONOSOL, L.L.C.                              GERALDINE SOAT BROWN

| (A) | | | | (B) | | | |
|---|---|---|---|---|---|---|---|
| SIGNATURE | | | | SIGNATURE | | | |
| NAME Bradford P. Lyerla | | | | NAME Jeffrey R. Gargano | | | |
| FIRM Wallenstein & Wagner, Ltd. | | | | FIRM Wallenstein & Wagner, Ltd. | | | |
| STREET ADDRESS 311 S. Wacker Drive, Suite 5300 | | | | STREET ADDRESS 311 South Wacker Drive, Suite 5300 | | | |
| CITY/STATE/ZIP Chicago, Illinois 60606 | | | | CITY/STATE/ZIP Chicago, Illinois 60606 | | | |
| TELEPHONE NUMBER (312) 554-3300 | | | | TELEPHONE NUMBER (312) 554-3300 | | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 3,127,392 | | | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6,210,852 | | | |
| MEMBER OF TRIAL BAR? | YES X | NO ☐ | | MEMBER OF TRIAL BAR? | YES ☐ | NO X | |
| TRIAL ATTORNEY? | YES X | NO ☐ | | TRIAL ATTORNEY? | YES ☐ | NO X | |
| DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO X | | DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO X | |
| (C) | | | | (D) | | | |
| SIGNATURE | | | | SIGNATURE | | | |
| NAME Austin J. Foley | | | | NAME | | | |
| FIRM Wallenstein & Wagner, Ltd. | | | | FIRM | | | |
| STREET ADDRESS 311 South Wacker Drive, Suite 5300 | | | | STREET ADDRESS | | | |
| CITY/STATE/ZIP Chicago, Illinois 60606 | | | | CITY/STATE/ZIP | | | |
| TELEPHONE NUMBER (312) 554-3300 | | | | TELEPHONE NUMBER | | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6,237,075 | | | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | | |
| MEMBER OF TRIAL BAR? | YES ☐ | NO X | | MEMBER OF TRIAL BAR? | YES ☐ | NO ☐ | |
| TRIAL ATTORNEY? | YES ☐ | NO X | | TRIAL ATTORNEY? | YES ☐ | NO ☐ | |
| DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO X | | DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ☐ | |